## WESTERN NAT. INS. CO. v. LE CLARE.

### No. 11425.

Circuit Court of Appeals, Ninth Circuit.

Aug. 13, 1947.

Rehearing Denied Oct. 24, 1947.

Royal A. Stewart, Morley Griswold, and George L. Vargas, all of Reno, Nev., for appellant.

John S. Sinai and John Bartlett, both of Reno, Nev., for appellee.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges.

MATHEWS, Circuit Judge.

This appeal is from a judgment on a verdict for $4,998 obtained by appellee, Charles A. LeClare, Jr., a citizen of Nevada, against appellant, Western National Insurance Company,[1] a California corporation, in an action by appellee against appellant on an alleged oral contract of fire insurance covering a house owned by appellee in Reno, Nevada—a contract alleged to have been made by appellant, acting by and through its agent, Clyde Raymond, and appellee, acting by and through his agents, Charles A. LeClare, Sr., and Lena Avanzino LeClare, appellee's parents, hereafter called Mr. and Mrs. LeClare.

Appellant contends that the evidence is insufficient to support the verdict because it does not show that appellee owned or had any insurable interest in the house, does not show that there was any consideration for the alleged contract, does not show the terms thereof with sufficient certainty and does not show that the risk was "allocated" to appellant. There is evidence to the following effect:

[1] Formerly called Occidental Insurance Company.

During the period from October 13, 1940, to August 20, 1942, the house and the land on which it stood were owned by appellee's grandmother, Mary Avanzino, hereafter called Mrs. Avanzino. To Mrs. Avanzino appellant issued two fire insurance policies —No. D101779 for $2,000 and No. D101-793 for $3,000, each covering the house. Policy No. D101779 was issued on October 13, 1940, and expired on October 13, 1943. Policy No. D101793 was issued on January 4, 1941, and expired on January 4, 1944.

On August 20, 1942, Mrs. Avanzino executed a deed conveying the house and land to appellee. The deed was recorded on December 12, 1942.

Mrs. Avanzino died testate on December 11, 1942. Mrs. LeClare was her executrix. In the probate court (a State court of Nevada) wherein Mrs. Avanzino's will was probated, an inventory of her estate was filed. The house and land conveyed to appellee were included in the inventory as if they were a part of the estate. Actually, they were owned by appellee when Mrs. Avanzino died and at all pertinent times thereafter.

Appellee joined the Army and, in the summer of 1943, was sent overseas. Before going overseas, he executed a general power of attorney to Mrs. LeClare, which she exercised until he returned to the United States in June, 1945. Thus, for a period of about two years, Mrs. LeClare was appellee's agent, as well as Mrs. Avanzino's executrix. In performing her duties as such agent and executrix, she sometimes acted by and through her husband, Mr. LeClare.

In April, 1941, and at all pertinent times thereafter, Raymond was appellant's duly authorized agent at Reno, Nevada. As such agent, he had in his possession copies of the policies (Nos. D101779 and D101793) issued by appellant to Mrs. Avanzino and knew the terms and expiration dates thereof. With these in mind, he had a conversation with Mr. LeClare in September or October, 1943, a conversation with Mr. and Mrs. LeClare on January 17, 1944, a con-

versation with Mr. LeClare in January or February, 1944, a conversation with Mrs. LeClare in March, 1944, a conversation with Mr. LeClare in March or April, 1944, and a conversation with Mrs. LeClare in April, 1944.

Raymond's conversation with Mr. LeClare in September or October, 1943, was prior to October 13, 1943. As to what was said in that conversation, Mr. LeClare testified: "[Raymond] told me there was a policy that was in effect then or was about to go out,[2] I forget which it was, but he [asked] what I wanted to do with the policy, and I told him I was going to keep it in effect, which we always had. He said, 'How does it stand now?' and I told him that the estate hadn't been settled, and the property was deeded to [appellee], and as soon as it was straightened out in court we would find out whether [the premium] would be paid by [appellee] or by the Avanzino estate. Well, he said 'Avanzinos have been customers of ours for 25 to 30 years,' and he said, 'I don't think we have anything to worry about.' He said. 'As long as you want to keep the policy, we will keep it in effect until we find out which way it is going to be decided in the court.'"

As to what occurred on January 17, 1944, Mr. LeClare testified: "[Raymond] came over to the house * * * We were taking my daughter to the hospital with pneumonia. I didn't have much time to talk to him. He said, 'I see you have plenty of troubles right now. When can you come up to the office and see me?' He said, 'There is another policy coming due,'[3] so I told him I would be up the end of the month." Mrs. LeClare testified: "[Raymond] came in and told me there was an insurance policy, and I told him I didn't feel much like talking about insurance, and we would see him later, and he said, 'Well, that is all right; you have enough trouble this morning,' and he said, 'You come up and see me later.'"

Raymond's conversation with Mr. LeClare in January or February, 1944, was later than January 17, 1944. As to what was

---

[2] As stated before, policy No. D101779 expired on October 13, 1943, and policy No. D101793 expired on January 4, 1944.

[3] See footnote 2.

said in that conversation, Mr. LeClare testified: "[Raymond] told me about this other policy, and I asked him, 'Why couldn't we have the same terms as we had on the first policy?' and he said, 'Yes, we can take care of it for you. You don't have to worry. It won't be long before it is settled in court.' I said, 'I don't think so.'"

As to what was said in Raymond's conversation with Mrs. LeClare in March, 1944, Mrs. LeClare testified: "[Raymond] called me up and asked me if the court had settled the house matter, and I told him not yet, and I told him that I still wanted to keep those policies in force, and when we came to some settlement I would pay for the premiums, being that I was acting for the estate and also my son. * * * So he said, 'Well, don't you worry, Mrs. LeClare, I will keep you covered until this matter is settled.'"

As to what was said in Raymond's conversation with Mr. LeClare in March or April, 1944, Mr. LeClare testified: "[Raymond] had the same talk again, that everything was all right, it [the house] was covered until it [the matter] was decided. He would like to know when it would be decided. I told him we thought it would be a very short time." Thereupon, under questioning, Mr. LeClare further testified:

"Q. Do you know what the amount of the first policy was? A. It was $2,000.

"Q. What was the amount of the second policy? A. Three thousand. * * *

"Q. When you talked to [Raymond] * * * did you discuss the second policy in the amount of $3,000, also? Did you? A. Yes, both of them at that time.[4]

"Q. And what did he say as to both of them? What did he say to you? A. Well, he said, 'We can handle them just the same way until that [matter] is settled in court.' He said, 'We will keep you covered until it is decided who pays for the policy.' So that is the way it was left there."

As to what was said in Raymond's conversation with Mrs. LeClare in April, 1944, Mrs. LeClare testified: "[Raymond] called me up again. Well, the matter wasn't settled, and I told him it wasn't, so he said, 'Well, now, don't worry, Mrs. LeClare, I will keep you covered.'"

In and by these conversations, Raymond, acting for and on behalf of appellant, and Mr. and Mrs. LeClare, acting for and on behalf of appellee and the Avanzino estate, made an oral contract of fire insurance whereby appellant, acting by and through Raymond, insured the house for $5,000.[5]

■ In these conversations, Raymond, acting for and on behalf of appellant, promised to insure the house. Mr. and Mrs. LeClare, acting for and on behalf of appellee and the Avanzino estate,. promised to pay the premium on this insurance.[6] That was a consideration for the contract. Mr. and Mrs. LeClare relied on Raymond's promise and did not procure insurance elsewhere. That, too, was a consideration for the contract.[7]

The contract was in effect from the time it was made—in or before April, 1944— to February 6, 1945.[8] The parties insured

[4] In March or April, 1944.

[5] Cf. National Liberty Ins. Co. of America v. Milligan, 9 Cir., 10 F.2d 483; Globe & Rutgers Fire Ins. Co. v. Draper, 9 Cir., 66 F.2d 985; Bankers Indemnity Ins. Co. v. Pinkerton, 9 Cir., 89 F.2d 194; Milwaukee Mechanics Ins. Co. v. Questa, 9 Cir., 155 F.2d 139.

[6] The premium was not to be paid in advance, but was to be paid when the probate court decided whether the house belonged to appellee or to the Avanzino estate. Cf. Tarleton v. DeVeuve, 9 Cir., 113 F.2d 290, 132 A.L.R. 343.

[7] Nord Deutsche Ins. Co. of Hamburg, Germany, v. Hart, 2 Cir., 230 F. 809; Massachusetts Bonding & Ins. Co. v. R.

E. Parsons Electric Co., 8 Cir., 61 F.2d 264, 92 A.L.R. 218.

[8] On February 6, 1945, in the matter of the Avanzino estate, the probate court entered an order declaring that the house and land were "incorrectly included in the inventory and appraisement filed * * * in this court and cause;" that "said real property does not belong to this estate, but belongs to [appellee], upon the payment by him of the full amount of the principal and interest due on the mortgage or mortgages against said property;" and that "the devisees and legatees named in the will have signed and filed quitclaim deeds and releases to said property and waive all claim thereto in favor of [appellee]."

by the contract were appellee and the Avanzino estate, as their interests, if any, in the house might appear.[9] In other respects, the terms of the contract were similar to those of the policies issued to Mrs. Avanzino. Its terms were shown with sufficient certainty.

■ Raymond represented appellant and seven other fire insurance companies. Mr. and Mrs. LeClare knew that he represented appellant, but, so far as the evidence shows, they never knew that he represented any other company. They dealt with him, and he with them, not as the agent of a group of companies, but as the agent of a single company, namely, appellant. The contract, therefore, made appellant the insurer of the house. The risk did not have to be "allocated".

On July 19, 1944, while the contract was in effect, the house was damaged by fire. The damages amounted to $4,998, payment of which was demanded and refused. Appellant's brief states: "There is no question as to the amount of the damages and it is conceded by the appellants [10] that if [appellee] is entitled to anything on the record as made, he is entitled to the amount awarded by the jury."

■ We conclude that the verdict is supported by the evidence.

Appellant contends that the trial court erred in refusing to instruct the jury, as requested by appellant, that "where an insurance agent represents two or more companies, no one of them can be bound until the agent allocates the risk or some portion thereof to one of the companies by some word or act." It is apparent from what has been said above that this instruction was properly refused.

■ One of the points stated in appellant's statement of points [11] was that "The evidence is insufficient to show compliance by the insured with the alleged terms of the alleged contracts, which were prerequisite to a recovery upon them." This point was not argued by appellant, in its brief or orally, and hence is deemed abandoned.[12]

■ Three points argued by appellant were that the evidence is neither clear nor convincing; that it does not show Raymond's authority to enter into an oral contract for or on behalf of appellant; and that it does not show Mr. LeClare's authority to act for or on behalf of appellee. These points were not stated in appellant's statement of points and hence need not be considered by us.[13] However, we have considered them and find no merit in them.

Judgment affirmed.

---

[9] It appeared that the estate had no such interest.

[10] There is only one appellant.

[11] Our Rule 19(6) provides: "The appellant shall, upon the filing of the record in this court, * * * file with the clerk a concise statement of the points on which he intends to rely on the appeal, and designate the parts of the record which he thinks necessary for the consideration thereof, and forthwith serve on the adverse party a copy of such statement and designation. The adverse party, within 10 days thereafter, may designate in writing, filed with the clerk, additional parts of the record which he thinks material; and if he shall not do so, he shall be held to have consented to a hearing on the parts designated. If parts of the record shall be so designated by one or both of the parties, or if such parts be distinctly designated by stipulation of counsel for the respective parties, the clerk shall

print those parts only; and the court will consider nothing but those parts of the record and the points so stated."

[12] Mittry Bros. Const. Co. v. United States ex rel. Krengel, 9 Cir., 75 F.2d 79; United States v. Los Angeles Soap Co., 9 Cir., 83 F.2d 875; Radius v. Travelers Ins. Co., 9 Cir., 87 F.2d 412; Lewis v. Standard Oil Co., 9 Cir., 88 F.2d 512; Liquid Veneer Corporation v. Smuckler, 9 Cir., 90 F.2d 196; Bank of Eureka v. Partington, 9 Cir., 91 F.2d 587; Paramount Productions v. Smith, 9 Cir., 91 F.2d 863; Suffel v. Bosworth, 9 Cir., 95 F.2d 494; Moore v. Tremelling, 9 Cir., 100 F.2d 39, 43; Peck v. Shell Oil Co., 9 Cir., 142 F.2d 141; Stetson v. United States, 9 Cir., 155 F.2d 359; McBride v. Farrington, 9 Cir., 156 F.2d 971.

[13] See our Rule 19(6); Bank of America National Trust & Savings Ass'n v. Commissioner, 9 Cir., 126 F.2d 48.